**53 So.2d 246**

**BROCATO v. SUN UNDERWRITERS INS. CO. OF NEW YORK.**

**No. 40047.**

May 28, 1951.

Sam Monk Zelden and Max Zelden, New Orleans, for plaintiff-appellant.

Lemle & Kelleher and H. Martin Hunley, Jr., all of New Orleans, for defendant-appellee.

LE BLANC, Justice.

This is a suit on a policy of windstorm insurance covering the premises bearing Municipal Number 703, Esplanade Avenue in the City or New Orleans. The policy contract is dated March 5, 1947 and was in full force and effect on September 19, 1947 when a severe hurricane struck the city of New Orleans and, as a result, the insured premises were damaged by the force of the wind and by the water which fell through the damaged roof. The amount of the coverage was $10,000.00 and plaintiff claims that his property was damaged to the extent of $6413.00. In addition he claims that the condition of the premises has been such, due to the effects of the storm, that they have not been habitable since January 1948 and as a consequence he has lost a monthly revenue of $185.00 because of the enforced vacancy of five apartments in the building. His demand against the defendant insurance company is for $10,853.00

Plaintiff alleges that the defendant corporation, immediately after the storm, paid him his claims for damages on other of his properties insured by them but refused to pay the amount indicated by the estimate of an appraiser with reference to the premises located at 703 Esplanade Avenue; that since that time he has contacted defendant's agent in an attempt to settle the amount due under the policy but has been unsuccessful in arriving at an agreeable figure and that said con-

tacts have been continual until the present time (meaning the date on which suit was filed, January 16, 1950) when all negotiations have been broken off.

In its answer defendant admits its contract with the plaintiff and generally admits all the allegations of his petition but specially pleads in defense to his action the limitation clause contained in the policy to the effect that suit must be brought under its terms within twelve months from the date of the loss. Suit in this case having been instituted long after twelve months from the date of the loss sustained by plaintiff, if the limitation clause is to be held effective, it follows that his action is barred thereunder. It is the plaintiff's contention that by its admissions of liability, its negotiations for, and offers of settlement, that defendant has waived the limitation clause and is now estopped from invoking its provisions. After trial in the lower court the district judge held that there was no waiver, that plaintiff was bound by the limitation clause and accordingly he dismissed his suit. From a judgment so decreeing plaintiff took this appeal.

Plaintiff bought the policy sued on through an insurance solicitor or salesman by the name of Henry S. Hirsch to whom he had been giving all his insurance and Hirsch, following his usual custom, turned over the application to the insurance agency of Calhoun & Barnes, Inc., agents for the defendant corpora- tion, Sun Underwriters Insurance Company of New York. The record does not show that plaintiff filed a proof of loss at any time, but immediately following the hurricane, in fact on the same day according to Hirsch's testimony, he reported the damage that had occurred to Hirsch, over telephone, and Hirsch reported it to the agency who then turned the matter over to an adjuster.

The record reveals that the hurricane of September, 1947, caused damage to so many properties in New Orleans and the claims presented became so numerous that it was impossible for local adjusters to handle them all and it was necessary to call in outside adjusters on the job.

It is not certain under whose authority a contractor by the name of Earl E. Kennedy made an appraisement of the damage to the property at 703 Esplanade Avenue, but it appears from his testimony that the Central Adjustment Bureau did ask him to check some of plaintiff's property outside of the city and that he did so. This claim was duly paid, according to plaintiff's testimony. Plaintiff accompanied Kennedy on his trip on that inspection and informed him of the damage to his Esplanade Street property. Kennedy states that plaintiff told him he would contact his agent about it and he (Kennedy) thinks that it was Hirsch who called him and asked him to make an estimate. The testimony regarding the time when the estimate was made is very indefinite but

from it all we would judge that it was some time in the Spring of 1948. He says that he made another appraisement later on. There is filed in the record a letter addressed by him to the plaintiff, dated August 2, 1948, submitting an estimate of $6387.50.

In the meantime Calhoun & Barnes Inc. had referred the claim to three of those adjusters who had been called to New Orleans to assist in making estimates of the numerous claims that were pending. The first of these was a party by the name of W. W. Cason, residing in the State of Oklahoma, whose testimony was taken by deposition. He inspected the property in October, 1947 and reported no damage from the effects of the hurricane. We get the impression from his testimony that he was a bit irritated at plaintiff's failure to have kept an appointment with him and he appears to have been unfavorably influenced by that fact in making his report.

The second adjuster called in was A. Lee Abbey of Dallas, Texas, who made his inspection between January and February of 1948. His recollection was that, giving the assured all possible benefit of doubt, the damages would not have amounted to over five hundred or six hundred dollars but in an effort to settle the claim he offered him one thousand dollars which was rejected.

The third of these adjusters was Roland Vann of San Antonio, Texas, who says he inspected the premises some time be-

tween January and March 12, 1948 and whilst he kept no detailed figures of specific items and spoke of none to the assured, he remembered that after he had all his figures in his mind he told him that he would recommend that a settlement be made in the amount of $1800.00.

In July, 1948, the claim was re-assigned to Miller Adjustment Agency in New Orleans and a man by the name of William Foss was instructed to adjust the claim. According to his testimony, he was assigned the claim on June 8, 1948 and the first thing he did was to contact Kennedy who, he had been advised by his agency, was plaintiff's contractor. He and Kennedy met on the premises on July 12, 1948 with the plaintiff. He states that Kennedy had made a prior inspection but advised him that he would prepare an estimate and send it to him. He had to call him a couple of times and he finally sent in a report of over $6000.00 which he considered excessive. He then called in another contractor by the name of George Lupo and together they made an estimate showing a damage of some $2900.-00. At the meeting with Kennedy and plaintiff, the latter made no claim for any amount and he did not see him any more until August 22, 1948 when he met him in the Roosevelt Hotel. They discussed the claim and he told plaintiff that he was willing to offer him $2200.00 as a settlement but plaintiff refused; saying it was too low. He says that plaintiff did not say

how much he wanted but neither does it appear from his testimony, that he indicated that $2200.00 was his final offer.

The matter seems to have remained in this status until about April 15, 1949 when plaintiff consulted the attorney who represents him in this suit. The attorney first contacted Hirsch, apparently without any result and he then contacted Foss, the adjuster, who told him that his agency had no longer any interest in the matter because prescription had accrued. He then contacted Mr. A. M. Barnes, Jr. of the Calhoun & Barnes agency and in response to his request of September 15, 1949 he transmitted to him, by letter, what was referred to as a "copy of the above captioned policy". Afterwards he says he talked several times to Mr. Barnes and in December 1949, Barnes made a concrete offer to settle the claim for $1500.00. After consulting with plaintiff, suit was filed in January 1950.

The testimony of A. M. Barnes, Sr., president of the Calhoun-Barnes agency is not of much assistance to the Court. He only remembered having had a telephone conversation with either plaintiff or the latter's attorney at some time which he fixes as of January, 1950. The party he spoke to wanted to know if a settlement would be made and all he told him was that he would have to talk to Miller Adjustment Agency about it.

The testimony of Mr. A. M. Barnes, Jr., vice-president of the agency, is a bit more elucidating. From him it is learned that when the out of town adjusters were called in, a new adjustment bureau which he calls the General Adjustment Bureau was set up for the purpose of handling claims under this particular storm and that after the three adjusters to whom they had referred it were unsuccessful in settling plaintiff's claim, their agency (Calhoun-Barnes, Inc.) referred it to the Miller Adjustment Bureau. That was in July 1948. The negotiations of this bureau through their adjuster, Foss, have heretofore been disclosed and it is unnecessary to recite them here. According to the witness Barnes, the Miller Bureau file on this claim was still active in June 1949. When asked if the assured had come in May and said "I will take $1500.00 or $1000.00 or $400.00" the witness before the question was completed, stated: "I will answer truthfully, we would have adjusted any year. The company was not trying to get out of paying the loss." He had no recollection of the December 1949 conversation and the offer of $1500.00 plaintiff's attorney testified about but he did recall that in September of that year there was an offer of $2200.00 He would not attempt to use the exact words in which it was made, but in effect he says they were "that Miller Adjustment offered $2200.00, and I feel sure the company would still make you that offer."

We have investigated the testimony very carefully and referred to the pertinent parts

of it at some length in order to better reach a conclusion on the important issue that is involved in the case, that is, whether or not there was a waiver by the defendant insurance company of the limitation clause in the policy.

In 29 Am.Jur., Insurance, Sec. 1402, the general rule of law on this question is laid down as follows: "An insurer may waive the provision of the insurance contract which limits the time within which the insured may bring suit to enforce the payment of claims for losses alleged to be covered by the contract, and such waiver need not be in writing, but may be made orally, or the insurer may by its acts and conduct be estopped from asserting such provision as a defense to an action on a policy. The insurer cannot hold out the hope of an amicable adjustment of the loss, and thus delay the action of the insured, and then plead the delay, caused by his own conduct, as a defense to the action when brought."

In support of their contention that there was a waiver in this case, counsel for plaintiff rely strongly on the case of Turner v. Bankers & Shippers Insurance Company of New York, La.App., 187 So. 122, a decision of the Court of Appeal of Orleans Parish. There is language in the opinion to the effect that the admission of liability under the policy may operate as a waiver by the company of the contractual limitation and that the policy stipulation could not later be revived. If what was meant by the language used in the opinion was that the mere admission of liability operates as a waiver, we would say that we are not in accord entirely with the statement. We find on examining the case however, that the statement really was not necessary for the decision as the suit was not brought on the policy itself but on an agreement entered into between the insurer and the assured relative to some form of settlement of the claim under it.

We would say, however, that the admission of liability is an important element that can be taken into consideration when coupled with other factors, in determining whether the assured may be said to have been lulled into a sense of security or a feeling of hope that his claim on the policy itself would be settled without the necessity of him having to incur the fees of an attorney-at-law or the costs of a judicial proceeding, or both, in order to obtain a settlement. Where, in a case like the present, you have an admission of liability coupled with prolonged negotiations through different adjusters, and offers of settlement, the amount of which is stepped up from $1000.00 to $1800.00 and then to $2200.00, it is reasonable to conclude that the assured was led to believe that the insurance company would settle his claim without suit and would not invoke the provisions of the limitation clause in the policy.

The trial judge concluded that the last offer of settlement made to the plaintiff, and which was refused by him, was in August 1948, at which time plaintiff still had almost a month within which to file suit. At that time however, the period of limitation had not yet accrued. If nothing further had happened from then on it might very well be that plaintiff would have been bound by the limitation clause, but as noted from the testimony of defendant witness Barnes Jr., as late as June, 1949 the file of the Miller Adjustment Bureau which was handling the claim was still active and even in September of that year we find defendant's agent still offering to settle the claim for $2200.00. Taking this witness at his word when he says that they would have adjusted the claim in any year, and that the company was not trying to get out of paying the loss, we believe that the insured was justified in assuming that they no longer considered the limitation clause in the policy to be in effect and he was not called on to institute suit until it was positively made known to him that he was not going to be paid the amount he was demanding or a greater sum than the one included in their final offer of settlement.

■ It is urged on behalf of defendant that to allow the waiver in this case would subject insurance companies to very severe hardships in the settling and adjusting of claims because if the one year limitation is held to be waived by an admission of liability, the ten year prescription on personal actions under Article 3544 of the Civil Code would be the only one available to them. But as already stated, we are of the opinion that admission of liability is not of itself sufficient to constitute a waiver. In line with what the weight of authority seems to be, we hold that an admission of liability together with other acts and conduct on the part of the insurer, and other circumstances such as appear in this case, from which the insured is induced to believe that his claim would be settled without suit precludes the insurer from invoking the limitation clause of the policy.

■ On this issue the judgment appealed from is found to be erroneous and will have to be reversed. The only remaining question relates to the award that is to be made and as we find the record complete enough we will render final judgment in the case.

■ There were only two appraisals of the damage to the insured premises that were made with any degree of detailed accuracy. Those were the estimates of the two contractors, Kennedy and Lupo. Kennedy's estimate of the cost of repair to the building included replacing the roof in its entirety and a general replastering and repainting of most of the rooms. Lupo's estimate, on the other hand, involves the cost of repairs made necessary by reason of the damage caused by the storm, which after all, is the loss covered by the

policy. The Kennedy appraisal was $6387.-50, Lupo's was $2971.50. The difference in amount between them reflects the difference in the idea each had in mind in making his estimate. It is quite obvious that the Lupo appraisal is the one which should guide this Court in making the award.

█ In arriving at the amount of $2200.-00 as his offer of settlement, the adjuster, William Foss, says that he based it on the Lupo report and took off about $700.00 because the building was in a very poor, run-down condition, and also because of the fact that a considerable amount of the damage was caused by the failure of the insured to have made temporary repairs. The run-down condition of the building which the adjuster uses as part of the basis in arriving at the $700.00 figure had nothing to do with the claim for damages caused by the storm for which it had been insured by the defendant. It was no doubt in the same condition when the policy was issued just six months before the storm. Moreover Lupo did not take its run-down condition into consideration when he made his estimate a few months after the storm. He did consider some extra damage caused by water falling through the roof because of the lack of temporary repairs immediately following the storm. These are the emergency repairs the assured was called on to make and which he testifies he had made. His testimony on this point is not impressive however. He does not recall the name of the man he engaged to make them and has no record or receipt of payment for his services. He only remembers that he paid him $60.00 in cash. Lupo states that when he made his inspection he saw no indication of any temporary repairs.

█ For his neglect in making or having had such repairs made, plaintiff would be chargeable with the extra damage resulting therefrom if the record contained the necessary proof of the cost of repairing it. The figure of $700.00 used by the witness Foss appears to be purely arbitrary and in it is included what he calls the run-down condition of the building which, as we have stated, cannot be considered. The contractor Lupo did not separate the cost of the extra damage caused by lack of temporary repairs from the rest of his estimate and therefore we are left without proof on which to base any amount. The burden rested on the insurance company to show what the charge should be against the total estimate which Foss apparently considered to be correct. We have no alternative other than to adopt it as the amount for which the defendant should be held liable. The claim for loss of revenues from the property is not an element of damages in the case and no serious attempt seems to have been made to support it.

For the reasons assigned it is ordered that the judgment appealed from be and

the same is hereby reversed, avoided and set aside and it is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, James L. Brocato, and against the defendant, Sun Underwriters Insurance Company of New York, in the full and entire sum of $2971.50, with legal interest from date of judicial demand until paid and for all costs of this proceeding.

FOURNET, C. J., absent.

McCALEB, Judge (concurring).

I am in accord with the opinion of the Court of Appeal for the Parish of Orleans in Turner v. Bankers & Shippers Ins. Co. of New York, La.App., 187 So. 122 (which I authored) holding that an unqualified admission of liability is sufficient, of itself, to operate as a waiver by the insurer of the contractual limitation inserted in the policy.

Additionally, I cannot agree with the indication of the majority that, in order for a waiver to be effective, it must occur after the accrual of the contractual prescription. I see no reason why the waiver of a provision in a contract, inserted for one's benefit, cannot be made at any time.

In all other respects, I am in agreement with the prevailing opinion.